Alexander Orenstein v. CITRIX SYSTEMS 2011-13-08 Mr. Zito. Good morning, Your Honor. I am Joseph Zito here on behalf of the appellant Alexander Orenstein. If it pleases the court, I would like to first point to a couple of pages from the appendix. Page A-276, which is the section titled Invalidity of the Report of Dr. Fortas, which is the entire basis for the decision in the court below. You'll note in paragraph 308 and 309 he describes what anticipation is and what invalidity on obviousness is. If you then look at the conclusion page of the report, which is at A-364, he merely concludes in paragraph 567 that the claims of both patents are invalid. At no point does Dr. Fortas say whether he believes they're invalid under 102 or 103, whether they're anticipated by a single piece of prior art or whether they're anticipated by a combination of prior art. So there isn't a basis in the Fortas report, which is the only basis to sustain a decision below, of anticipation or obviousness. If you then look at the meat of the report on Claim 1 that we're looking at, which begins on A-277 and runs to A-281, I believe. Yes. You will see that he recites an element of the claim and then recites several pieces of prior art and doesn't ever match the two up. He just says that co-cession, et cetera, let users access services. You want to tell us in your limited amount of time the significance of these facts you're reciting? Okay. What the court has done below and what Dr. Fortas has done is oversimplify the claims by avoiding claim construction. As we pointed out in our brief below, we had petitioned the court very early on for a claim construction, which the court denied. The court then went on to find invalidity by anticipation on a report that doesn't provide any anticipation evidence. This was pointed out below. It was pointed out in our briefs here. And that's the point, Your Honor, is that there isn't evidence to sustain what they're saying. And if you actually look at what the claims mean, what the patent says, the specification of the patent, it's nothing like any of these pieces of prior art. Let's go directly to one of the terms that's used in the claim, application server. What's your definition of application server? Okay. That is a server, not a second computer, as in the prior art, that allows limited access to the applications that it's serving. It does not allow unfettered access to the entire server. In the prior art, and this distinction needs to be made with the prior art, you have two computers, as Forten says, a first computer and a second computer, which are co-equal computers. One can control the other or the other can control it back depending on which one you're sitting at. That's not an application server. That's just two independent PCs, one of which can control the other using the prior art. An application server is a dedicated machine, as explained in the patent, that allows limited access to an application that it is serving to the remote PC. It is not a machine that can be taken over. It's a machine that serves, but only serves applications. Very critical. These are not, none of the terms in these claims are common terms of art, including the very first term, which says a secured system. Low-level interface. A client station is frequently encountered in the art. That kind of term. Actually, I think a number of these terms are terms that I've certainly run into, and I'm not an expert in this area. Yes, that's correct. The word client and server are found in the prior art and are common terms. A client station. We know what a client station is, right? Yes, but a client station that has a low-level interface and a high-level interface isn't a common client station. There are building blocks that are then modified by further terms. Yes, client station is, but a client station as defined in the claims has other aspects to it as recited in the claims, and so it becomes something different than your common client station. It's a modified client station, if you will. And it's important, and it was important for the court below to actually do that rigorous claim construction before you can possibly apply prior art. Because what's done here, if you look at it, is what Fortas has said is there's lots of client stations, there's lots of servers out there. Look, it's anticipated. There are lots of communications. Look, it's anticipated, or it's obvious. Without analyzing what that means, of course it would be if you take that superficial view, but then the examiner never would have allowed this patent if that's the superficial view that should be given to these claims. Dr. Fortas says the claims claim nothing other than having a client, as you say, and having a server somewhere else and communicating between the two. And that's not what the invention is. That's not what the claims have. Just as this case came up before on what a controller is, the court below needs to actually look at the patent, the intrinsic evidence, and determine what this patent means. Well, again, to be specific, I'm interested in knowing exactly which terms. You've mentioned already application server as having a specific definition, so I understand your position on that. Can you point to other terms in the claim that have this patent-specific meaning that it goes beyond and is more specific than Dr. Fortas' general characterization? Well, the high-level application logic and the low-level application logic, as well as the high-level interface and the low-level interface, have specific meanings. In the prior art, the interface between the first computer and the second computer, or the remote and the host, depending on which way they're called in the prior art, is an open-ended, complete communication. The remote computer takes over and has complete control of the host. It can do anything it wants to. That's not a low-level interface. That's not a high-level interface as defined. That's just a completely open interaction between the two computers. As defined very explicitly in the patent, the low-level interface prevents control of the server by the remote computer or the client station. It also allows control of the peripherals to the client station by the server. It allows for the server to serve the application to the client in this low-level, i.e., restricted interface, without opening up its own operating system and any control of the server itself. Low-level interface is a coined term in the patent and needs to be looked at that way. It has a very different meaning than an open access system, such as in the prior art, where you can completely control the other one. The same as the high-level application services, it allows the server at a high level to make decisions as to which applications it's going to serve to which client, which applications it's not going to serve to which client, and which parts of its system it completely hides from and does not allow the client to see. And that kind of analysis is not put forth in Fortis's opinion because it wasn't done by the corpolo and it wasn't done by Citrix. Because when you do that kind of analysis, you see that these simple programs of Coast Station or PC Anywhere don't have that kind of sophistication. They don't make those distinctions. They don't have an application server. All right. That really is the heart of the invention, isn't it? Not to oversimplify, but it does seem that this is consistent with what you're saying. What you've got is a client that has access to a server that has the application, but critically, the server does not open its entire operating system to the client. It selects only the application to be available to the client and nothing more. And then the server takes over the client's low-level, whether it's the printer or the screen or whatever needs to be taken over in order to convey the information that needs to be conveyed to the client. And then at the end of the day, there's no permanent storing of the data. On the server. On the server. Correct. Is that a fair summary of the entire claim? That's a very good, fair summary. All right. And the patent lays that out and shows where the other two systems, which are the prior art, fail to do that. And you get to that description in the claim with the term application server, low-level interface and high-level interface and low-level, I'm sorry, what was the other term? The high-level operating system. Yes. Okay. Because the prior art sets out that there was two other ways of doing it. Those didn't work. And here's the best one. Okay. Okay. And we can go through. The other ways were the open access. No, I read that in the text. And that's pretty much our entire position, that you can't invalidate a claim without deciding what the claim means. You can't just take a superficial look at it. Because if you take a superficial look at most claims, you can always find something in the prior art that superficially looks the same, has a couple of the same words. We've also pointed out several errors of law that were made in the decision of the judge, including shifting the burden. Also, in the judgment on page three, the court has it backwards. They say that Dr. Fortas assumed and used a broad claim construction when he looked at invalidity and a narrow claim construction for infringement. Well, that's the old nose of wax. You can't change how you read your claim construction, whether you're discussing validity or infringement. And that's exactly what the court admits that Dr. Fortas did, including looking at a claim construction that he didn't agree with. Okay. There's also some errors in there about when prior art. The district court believed that prior art became prior art if it existed before the issuance of the patent, as opposed to the filing date. And that's in footnote one. You're well into your rebuttal time, Mr. Zito, which you wanted to reserve. Let me reserve the rest of this. Mr. Klein. Good morning, Your Honors. May it please the court. I'm Doug Klein from Goodwin-Fochter for Citrix. There are three basic points I'd like to address, in addition to addressing some of the points that Mr. Zito made. First is fairness to the district court. This court should not second-guess the district court's opinion and ruling based on arguments that prior counsel for Mr. Ornstein never presented to the district court. And the district court certainly didn't abuse its discretion in setting the schedule for how summary judgment would be briefed, both initially and on remand. Second point I'd like to address is Citrix, in fact, did present clear and convincing evidence that Claim 1 of the 942 patent is anticipated by the prior art. That can be found in the prior art references themselves. That can be found in Dr. Fortes' report, which was submitted by affidavit with a motion for summary judgment. That can be found in Exhibit E to Citrix's motion for summary judgment, which correlates the prior art against the elements of Claim 1. What about your friend's argument that a lot of Dr. Fortes' expert report was predicated on assumptions with regard to claim construction, and the district court didn't do a claim construction here? Are we to assume that we just used the plain and ordinary meaning? Are we to assume that the district court looked at what Dr. Fortes said and said, yeah, he's got the right claim construction, so I'm just going to sort of adopt that? How are we supposed to construe that? Fair enough. Dr. Fortes presented a detailed claim construction. That can be found at page 13 of his report, which at the appendix is page 204. He goes through all of the claim constructions that he relies upon. This court, on a prior appeal, did disagree with Dr. Fortes' claim construction of controller, and that was the only claim term that genuinely was in dispute below. Mr. Orenstein never presented any genuine dispute to any of the claim constructions that Dr. Fortes offered. He didn't present below competing constructions of low-level interface, for example. That comes up only in the blue brief filed here. What I would say specifically about the low-level interface limitation, to the extent the court does entertain that issue, which in our view it shouldn't because it was not presented below. But if you take a quick look at the claims of the patents themselves, claim four of the 942 patent addresses the low-level interface limitation. Claim four talks about where in the at least one client station further includes a low-level quasi-operating system for supporting client station connections. That's referred to in the specification as the OSSI interface. Claim differentiation tells us then that's not a limitation of claim one. This argument was never made to the district court because Mr. Orenstein's prior counsel never gave the district court an opportunity to consider it or an opportunity to Citrix to respond to an argument that shows up for the very first time in the blue brief. So it's a distraction here on appeal. Well, when you say this argument, specifically, which argument are you referring to? The argument that low-level interface should be entitled to some... You're talking about the low-level interface. Right. The same thing with application server. I respectfully take a different view from Your Honor about what the heart of the invention described in claim one is. The heart of the invention is not a client server that provides only limited access to an application server that provides only limited access to a client. The heart of the invention in claim one, and if we focus on the claims, is that the client server does not... It has access... Pardon me. That the application server has access to the drives of the client. That's a feature that's referred to in the prior art often as drive redirection or drive mapping so that the server can see the drives on the client. So maybe I have a Word document on my client, but the application of Word that I'm using is on a server somewhere else. That server can see my drive and work with my Word document. And the server... That seems to be the essence of the blue brief. The blue brief goes on to say, though, that the client doesn't get access to the control level of the server. Well, that's certainly... that concept is certainly found in the specification. It's talked about in the specification. But your argument is that it isn't encompassed within claim one? No. In fact, I would say, Your Honor, take a look at claim 15. Claim 15 says the system of claim one wherein set at least one application server further includes a file system having code wherein the at least one client station is denied access to the file system of the at least one application server. That limited access by the client to the application server, that comes up in later claims. I certainly agree, as anybody would have to. It's discussed in the specification. I mean, it's the gist of what this patent generally is addressed to. Would you agree with that? It's just that your claim is that, well, claim one is broader than that and therefore reads on much of the prior art. Well, I would have to say, I wouldn't characterize it as the gist. The gist is probably a bad word to use in the patent area, but I think... Right. But I think it's a feature described in the specification together with others. I think the gist, if you will, of claim one is that the application server has access to the drives of the client. It can use data from the drives of the client, but it does not permanently store that data on the application server. So that data is protected. Now, where in the prior art, and I looked at your citations of the prior art, but where in the prior art is the... would I find the limitation that the... that refers to the at least one application program without permanently storing said data in a server device? If we took a look at, if we take a look at page 207 of the appendix. 2007. I'm told I misspoke. 2007, that's the... That's the reach out reference. Right. Mm-hmm. You cited 2008... Right, and if I show 2007, Your Honor, page 66, chapter 6. Right. The last paragraph that begins and ends on the page, the sentence halfway through. You can use remote control to open a host application and edit viewer files without actually copying the files to the host computer. This feature can be useful if you do not want a copy... I see. ...of your file to exist on the host computer. Okay, all right. Precisely that limitation, Your Honor. All right. And with respect to Your Honor's question about what did Judge Jordan do below, he made rulings about the claim constructions that genuinely were in dispute. He made a ruling on controller. This court disagreed. He went back on remand, and he found that to the extent a ruler can be a general purpose computer, the patented invention is found in the prior art, as described in Claim 1. He includes a very thorough analysis, page 5 of his opinion, the middle paragraph, the second paragraph that begins. He steps through the claims and talks about the features of the claims. He has parentheticals. This is what I take it to mean. This is where these features are found in the prior art. He does that by looking at the Fortes report, and the blue brief says that Fortes didn't submit a claim chart. Well, he's got paragraphs in his report, and he's got an element of the claim, and that's followed by a description of where in the prior art that element is found in the prior art, and it's with citation. So certainly he could have built that into a table, and maybe we more conventionally would call that a claim chart, but it certainly substantively is a claim chart. Pardon me. No, go ahead. I would also say Judge Jordan relied on Exhibit E to Citrix's motion for summary judgment. What did Citrix do? How did it create Exhibit E? Citrix had to fight below to get Ornstein to disclose his infringement contentions. In response to a motion to compel, finally Ornstein disclosed his infringement contentions by providing a chart that was the claims down the left-hand column and allegations about an infringement correlating Citrix's metaframe product in the next column on an element-by-element basis. Citrix took that chart and added a third column, and it correlated elements of the prior art into the third column and showed how the prior art lines up with Ornstein's Claim 1 in exactly the same manner that Ornstein contends Citrix's infringement lines up. So talk about the nose of wax. That's exactly the nose of wax, Your Honor. You can't argue that their claims cover Citrix for infringement but don't cover the prior art. And you're right, a client station is a piece of it. Right. What is the – well, what is your understanding of the high-level application logic and low-level independent logics? The high-level application logic is Word. Word runs a word processing program. The low-level application logic is your printer driver. Okay. So, again, the patent talks about Word running on an application server being able to run the driver to print at the client. Right. That's described in the prior art as remote printing. All right. The monitor, the driver that runs the monitor, the application, which is running at the application server, sends images that come up on the monitor of the client station. Right. Now, one other question. Returning to what I happily call the gist, at least as Ornstein used it, the gist of the invention, is there any prior art in the prior art that you have cited that does include the limited access to the application server of the sort that Mr. Zito was describing? And it's colloquy with me. Yes, there is, Your Honor. If you look at page 704 of the appendix, that was a co-session reference, just for example. There are several citations, Your Honor. The first I have, page 704, which is the co-session manual. Host PC, do you see that, Your Honor? Yes. The last sentence, however, the host PC can disallow selected privileges based on the identity of the connected remote control PC user. Another instance, Your Honor? Now, this was referenced, I think, by Dr. Fortas. Yes. Because I didn't have it in my, oh, yes, I did. All right. I see. Okay. Some other instances, Your Honor, I have a note in my outline for today at page 798, or how about page 769? A directory access. The host PC you call may have background file access restricted to specific directories. The host restricts access to the directory list stored in the directory access restriction option on the host. If these contain any directory lists, then you can transfer and move the leader files only in the listed directory. And just for efficiency, Your Honor, I have a reference at page 798 of the appendix to restricted access. Again, on page 798, the co-session manual note, you can choose phone book entry and host option setting that restrict a remote PC's access to your PC. So, that feature as well is plainly described in the prior article. So, I take it that your position would be that even assuming that claim one reads on the gist as characterized in my copy of Mr. Zito. Right. And is limited to that environment. That's correct. That there's still anticipation. Certainly. Absolutely, Your Honor. And the principal reference would be the one that starts on 700 or thereabouts? Yeah, it's the co-session reference. Co-session. I was focused there with the references, with the citations that I mentioned, Your Honor. Okay. Thank you. Right. So, the three points I had wanted to make, we've certainly addressed the fairness. Again, I would say this argument was not put before the district court. The district court's job was to construe claim terms that genuinely were in dispute. And it's not fair to the district court to hear arguments that it didn't have the benefit of considering. We've talked quite a bit. Well, I'm not sure that the argument, and I guess it depends on how you characterize the argument. The argument that we've been discussing wasn't before the district court. At one point, and this is in the initial acquisition to summary judgment way back when. Right. It's toward the end, but the statement is made, the application server serves only upon the applications, thereby inhibiting access to the command shell of the underlying operating system by limiting the client station to only the application services of the selective application. That's the gist of Mr. Zito's argument. I agree with you, Your Honor. Mr. Zito's argument. Mr. Prior Counsel included that statement at the very end of the opposition for motion summary judgment in a section that talks about claim construction. It just says there are some claim construction issues. Never identifies why or whether that matters. Doesn't say to the district court, we have a dispute about this claim term. You should find it is narrowly construed, and if you do, the prior art does not disclose it. Never says that to the district court. So the district court doesn't get the opportunity to consider the questions you just asked. Do the references disclose that feature? Citrix never gets the opportunity at the district court to point out the citations that I just pointed out to this court. So I don't think the argument properly was before the district court. Okay. And what I would say about that, Your Honor, is from the district court's opinion, or from oral argument on this, the district court said to Prior Counsel, what do you think I'm supposed to do with an expert report that is unrebutted? Mr. Ornstein never presented any evidence to raise a genuine issue of this material fact. He never deposed Citrix's expert. He never presented a rebuttal expert report. He never presented an affidavit of his own disputing the contentions that Citrix made about invalidity. He never even cited the prior art to argue that it does not disclose features of the invention as Citrix and its expert explained that it did. So he should not be permitted before to do so here. What was Judge Jordan to do with an unrebutted expert report? He was to do what he did. He was to grant summary judgment that Claim 1 of the 942 patent is invalid, and we ask this court to affirm that. Thank you, Mr. Klein. Thank you very much, Your Honor. Mr. Zito has up to three minutes left to rebut. I would rebut the fairness and no opportunity argument because it turns the situation on its head. Citrix is the one that moved for summary judgment, and they had the obligation to bring to the court a complete claim construction and all of these recent citations that we're hearing for the first time on appeal that somehow go to the actual definition of what a server and high level and low level is. To say that the opportunity was not presented by Orenstein is incorrect. Orenstein attempted and petitioned for a claim construction, which would have brought all these issues out. As you point out, now Orenstein raised that in the opposition. It was in a pretty offhand way, I have to say. I mean you'd have to go down pretty far into the weeds to find it, Franklin. I agree, Your Honor, but that doesn't shift the burden of the moving party who has to show that all of the elements of the claim are there to show invalidity. Because these citations that he's just cited don't actually show what the true meaning of the properly construed claim would be. As pointed out in the brief below, it's no access to the shell of the server. I'm paraphrasing. What Cosession does is that Cossession has access to the shell of the server. And then in some of these citations can decide which files and which parts may or may not be shared with the other half of the Cossession share. But Cossession does have access to the shell of the server and does control the server. It's different, again, without an actual claim construction. Is that different from saying that the Cossessions allows you to use either the embodiment that has restricted access or an embodiment that allows full access to the application server or to the server? Yes. How does it differ from that? Focusing now on the references that Mr. Klein called our attention to. Cossession itself, which is both machines are using Cossession. One is the host and one is the remote. The host Cossession, according to the citations that are raised here, can allow access or non-access to certain files. But to do that, Cossession itself is accessing the shell and the server and making the shell and the server potentially accessible to the remote session of Cossession. If you look at the background of the invention, it explains the disadvantages of... The background of the invention goes into not Cossession by name, but remote control applications. Well, I understand that. But the question is, does this particular capacity of Cossessions, if it is a capacity of Cossessions, to restrict the client from full access to the entire operating system of the server? Is that something that is in Cossessions? And if so, why doesn't that read on even your construction of Claim 1? Okay. Because the restricted access is so critical to the invention, there is a separation between low-level and high-level functioning by having a server and then a separate application server device that is linked differently to the server that's serving the application. I'm getting into some of the detail there, but it's actually in Claim 1 that isolates the two. Whereas Cossession does not do that. Cossession runs on the exact same PC, which is, again, not a server. It's just a second PC, as it's referred to. First PC, second PC, as referred to by Dr. Forrest in Cossession. Whereas... Thank you, Mr. Zito. I think your time has been concluded. We'll take the case under advisement. Thank you.